301 Ga. 267
FINAL COPY

S17A0088. CLEMENTS v. THE STATE.

MELTON, Presiding Justice.

Following a jury trial, Edward Clements, Jr., was found guilty of malice murder, felony murder, conspiracy to commit murder, and various other offenses in connection with a murder-for-hire plot that culminated in the shooting death of his wife, Joni.[1] On appeal, Clements contends, among other

---

[1] On June 2, 2011, Clements was indicted, along with his co-defendants Robert Sybert and Richard Sybert, for malice murder, four counts of possession of a firearm during the commission of a felony (in connection with the crimes of malice murder, burglary, aggravated battery, and kidnapping with bodily injury), conspiracy to commit murder, two counts of felony murder (predicated on burglary and aggravated battery), burglary, aggravated battery, aggravated assault, kidnapping with bodily injury, use of a sawed-off rifle to commit murder, and use of a firearm with a silencer to commit murder. Following an August 20-24, 2012 jury trial, Clements was found guilty on all counts. On August 29, 2012, the trial court sentenced Clements to life imprisonment without the possibility of parole for malice murder, a concurrent life term for kidnapping with bodily injury, twenty years concurrent for burglary, and five consecutive years for possession of a firearm during the commission of a felony. The two felony murder counts were vacated by operation of law (see Malcolm v. State, 263 Ga. 369 (4) (434 SE2d 479) (1993)), and the trial court also vacated the three remaining counts of possession of a firearm during the commission of a felony. See Stovall v. State, 287 Ga. 415 (5) (696 SE2d 633) (2010). The conspiracy to commit murder, aggravated assault, and aggravated battery counts were merged into the malice murder count for purposes of

things, that the evidence presented at trial was insufficient to support the verdict and that his trial counsel was ineffective. We affirm.

1. Viewed in the light most favorable to the jury's verdict, the record shows that, in October 2010, Clements told his good friend, Robert Sybert, that he would pay Sybert between $5,000 and $10,000 to kill Clements' wife, Joni. Prior to this conversation with Sybert, Clements had expressed to his co-workers at Robins Air Force Base that he was "tired" of his wife and looking for someone to "take care of her," and he had even asked a co-worker if he knew anyone who would kill for money. After the October 2010 conversation with Sybert, Sybert got his son, Richard, involved in the emerging plan to kill Joni,

sentencing. With respect to the remaining two charges of use of a sawed-off rifle to commit murder and use of a firearm with a silencer to commit murder, the trial court declined to enter a sentence on those charges at the August 29, 2012 sentencing hearing, opting instead to first hear additional arguments from the parties relating to those specific charges. Clements filed a motion for new trial on September 11, 2012, which he amended on September 17, 2015. Following a hearing, on October 15, 2015, the trial court granted the motion for new trial with respect to the use of a sawed-off rifle to commit murder and use of a firearm with a silencer to commit murder counts against Clements, and denied the motion for new trial in all other respects. Clements filed a timely appeal to this Court, and, following the payment of costs, his appeal was docketed in this Court to the term beginning in December 2016 and submitted for decision on the briefs.

2

and Clements offered to pay Richard $1,000, give him a car, and set up a date for him with a stripper if Richard would shoot and kill Joni. The three men came up with a plan in which Richard would enter Clements' house at a time when Joni was home alone and shoot her with a sawed-off .22 caliber rifle provided by Sybert. Clements gave Richard a key to his house so that he could get inside to shoot Joni when the time came to execute the plan.

About a week before the murder, Richard went to Clements' house with the intention of killing Joni and unlocked the front door of the house using the key that Clements had given to him. However, Joni was not present at the house at that time. Instead, Clements' daughter was there, so Richard quickly ran from the home. Clements' daughter notified the police about a man in a hoodie who had tried to open the door of the home and then ran away.

On February 8, 2011, Clements called Richard and told him that his wife would be at home alone. Sybert took Richard to Clements' house, and Richard again used the key given to him by Clements to unlock the front door. Richard was armed with his father's .22 caliber rifle. Richard had placed a homemade silencer on the weapon that he made with PVC pipe, black foam, and electrical tape. Richard called to Joni, who was upstairs at the time, and told her that

3

Clements had sent him to the house to give her an extra key that Clements had made for her. When Joni came downstairs to retrieve the key, Richard used the rifle to force Joni to go upstairs again. While Joni pled for her life, Richard forced her into a bedroom, where he shot her five times, killing her.

Richard was seen running from the house and across the street where his father, Sybert, picked him up in his car. The two men buried the murder weapon in an area behind their home, where it was later recovered by police.

Clements arrived at his home with his daughter shortly after police arrived in response to a 911 call about the murder. When police informed him that something terrible had happened to his wife, Clements calmly responded, "I've been at work[.] I have to clock in[.] I have to clock out, and I've got co-workers to say I was there." In the days following the murder, Sybert's nephew began to suspect that Richard might have had something to do with Joni's death, and, when he called Clements to tell him this, Clements dismissed this possibility. Clements then told Sybert's nephew not to tell the police. In addition to Sybert's nephew, Sybert's other son, Jonathan, also began to suspect that Richard was involved in Joni's murder. When Jonathan called Clements to inform him of his suspicions, Clements also told Jonathan not to tell anyone. However, Jonathan

4

went to the police.

Police questioned Richard and Sybert. During this questioning, Sybert admitted that Clements had approached him about killing Joni, and that his son had jumped at the opportunity because Clements was offering to give him some money, a car, and a "piece of ass." Then, on February 17, 2011, the police obtained a warrant to wiretap Clements' and Sybert's phones. The wiretapped calls involved several communications between Clements and the Syberts. The police also obtained telephone records that revealed several calls between Clements, Sybert, and Richard immediately before and after both the shooting of Joni and the incident at Clements' house a week prior where Richard had unlocked the front door to the home and then immediately ran away. There was also a March 4, 2011 wiretapped call in which the lead detective in the case, Detective Wright, spoke with Clements and asked him about the murder.

About a week after the murder, Richard left Georgia and went to Florida, where he was arrested on an unrelated felony. While being interviewed by Florida police, Richard confessed to murdering Joni and revealed Clements' and Sybert's involvement with it. Thereafter, Clements, Richard, and Sybert were charged with Joni's murder.

The evidence was sufficient to enable a rational trier of fact to find Clements guilty of all the crimes of which he was convicted beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-2-21 (parties to a crime).

2. Clements claims that the trial court erred in denying his motion to suppress evidence of the March 4, 2011 wiretapped phone conversation between Clements and Detective Wright wherein the detective asked Clements about Joni's murder. Clements contends that, because he had already invoked his Sixth Amendment right to counsel by hiring an attorney before the call took place, the police were not allowed to speak with him without his counsel being present. See Moran v. Burbine, 475 U. S. 412, 428 (III) (106 SCt 1135, 89 LE2d 410) (1986) ("[O]nce the [defendant's Sixth Amendment] right [to counsel] has attached, it follows that the police may not interfere with the efforts of a defendant's attorney to act as a 'medium' between the suspect and the State during the interrogation") (citation, punctuation and emphasis omitted).

Clements' argument is without merit, as the record reveals that his Sixth Amendment right to counsel had not yet attached at the time that his conversation with Detective Wright took place. Indeed,

6

[t]he Sixth Amendment . . . addresses an accused's right in all criminal prosecutions to have the assistance of counsel for his defense and "attaches only at the initiation of adversary criminal proceedings. . . . [B]efore [judicial] proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel." Davis v. United States, 512 U. S. 452 (114 SCt 2350, 129 LE2d 362, 369-370) (1994). See also Moran, [supra].

State v. Hatcher, 264 Ga. 556, 558 (448 SE2d 698) (1994). In this regard, the United States Supreme Court has emphasized that it would "make[ ] little sense to say that the Sixth Amendment right to counsel attaches at different times depending on the fortuity of whether the suspect or his family happens to have retained counsel prior to interrogation." Moran, supra, 475 U. S. at 430 (III).

Here, no formal criminal proceedings had been initiated against Clements at the time that his conversation with Detective Wright took place. He was not under arrest, confronted with any criminal charges, or in custody. He was merely speaking on the phone with the officer during an investigation in which no judicial proceedings had yet been initiated against him. Accordingly, Clements' Sixth Amendment right to counsel had not yet attached at the time of his March 4, 2011 telephone conversation with Detective Wright, and his hiring of an attorney prior to this conversation taking place did not change that fact.

7

Accordingly, the trial court did not err in denying Clements' motion to exclude the March 4, 2011 recorded telephone conversation from the evidence presented at trial. See, e.g., State v. Simmons, 260 Ga. 92 (390 SE2d 43) (1990).[2]

3. Clements asserts that his trial counsel was ineffective for (a) failing to try to get more Freemasons, employees from Robins Air Force Base, or aircraft workers like Clements onto the jury; and (b) failing to present witnesses to testify regarding statements that the Syberts allegedly made to other inmates while in jail. Clements has failed to meet his burden of showing ineffective assistance with respect to either of these claims.

> In order to succeed on his claim of ineffective assistance, [Clements] must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. Strickland v. Washington, 466 U. S. 668 (104 SC[t] 2052, 80 LE2d 674) (1984). If an appellant fails to meet his or her burden of proving either prong of the Strickland test, the reviewing court does not have to examine the other prong. Id. at 697 (IV);

---

[2] To the extent that Clements argues that the trial court erred by denying his motion for a mistrial based on the admission into evidence of this same March 4, 2011 recorded telephone conversation, this argument also fails as, again, the trial court committed no error by allowing this recorded conversation into evidence.

> Fuller v. State, 277 Ga. 505 (3) (591 SE2d 782) (2004). In reviewing the trial court's decision, "'[w]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" Robinson v. State, 277 Ga. 75, 76 (586 SE2d 313) (2003).

Wright v. State, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012).

(a) Clements' trial counsel did not testify at the motion for new trial hearing, and, "in the absence of evidence to the contrary, counsel's decisions are presumed to be strategic and thus insufficient to support an ineffective assistance of counsel claim." (Footnote omitted.) Washington v. State, 285 Ga. 541, 543 (3) (a) (i) (678 SE2d 900) (2009). Clements has not shown how counsel may have acted unreasonably during the jury selection process, and has not shown how, absent some deficiency in counsel's performance, a different jury would have been selected that would have reached a result more favorable to Clements at his trial. In any event, a defendant is "not constitutionally entitled to a [jury] venire . . . of any particular composition." (Punctuation omitted.) Sharp v. State, 278 Ga. 352, 353 (2) (602 SE2d 591) (2004). Accordingly, Clements' first claim of ineffective assistance fails.

(b) In addition to his failure to have his counsel testify at the motion for

9

new trial hearing, Clements also did not provide testimony from any witnesses regarding alleged statements made to them by the Syberts while they were incarcerated. Absent any evidence to show that his counsel acted unreasonably or that these alleged witnesses would have provided testimony favorable to Clements' defense, this ground of ineffective assistance of counsel must also fail. See Lupoe v. State, 284 Ga. 576 (3) (b) (669 SE2d 133) (2008).

Judgment affirmed. All the Justices concur.


Decided May 30, 2017.

Murder. Houston Superior Court. Before Judge Lukemire.

Jonathan P. Waters, for appellant.

George H. Hartwig III, District Attorney, Daniel P. Bibler, Assistant District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Vanessa T. Meyerhoefer, Assistant Attorney General, for appellee.